## Mershon *against* Baldridge.

The superintendent of common schools has no authority to decide a question of a contested election.

The time for holding elections of school directors in the townships is when the supervisors of the wards are elected, and in the boroughs, when the borough officers are elected.

ERROR to the common pleas of *Westmoreland* county.

Joseph Baldridge, Hugh Kells, Benjamin Blythely, Joseph Coulter and James Mahon against Daniel Mershon.

This was an action for money had and received, brought by the plaintiffs to recover from the defendant 219 dollars 44 cents, the amount of state appropriation which he had received as treasurer of the Youngstown school district in Westmoreland county.   In March 1835 a board of directors were elected for the Youngstown district under the provisions of the act of assembly of the 1st of April 1834; of this board James Toner was elected president, and has been elected president of said board annually ever since.   This board is designated the "Toner board."   Public schools were put in operation in the district under the provisions of the act of assembly, and

[Mershon v. Baldridge.]

the business conducted by this board down to the present time. In 1837 a difficulty, however, arose respecting the time of electing directors under the provisions of the act of assembly of the 13th of June 1836. By the second section of said act it is provided that, "annually, at the time and place that elections are held for supervisors and constables, and in wards and boroughs at the time and place of the borough election, and in like manner, two persons shall be elected school directors for each district, whose term of office shall be three years. Provided, that in districts where directors have not been elected, or in new districts which may be established by the division of a township or otherwise, six directors shall be elected in such districts at the first election, two to serve one year, two to serve two years, and two to serve three years."

By the act of incorporation of the borough of Youngstown, passed the 2d of April 1831, it is enacted by sections second and fourth that an election shall be held annually on the first Monday in May for the election of burgess, assistant burgess, town council, high constable, &c. The fifth section of the act of incorporation provides for the election of "two street supervisors, one assessor and two assistant assessors, at the same time and under like regulations and for the same purposes as are or shall be hereafter directed by law in the several townships within this commonwealth."

A portion of the citizens of the district were of opinion, that, under the provisions of the second section of the act of the 13th of June 1836, school directors should be elected in March, at the time the street supervisors were elected. The other portion of the citizens were of opinion that school directors should be elected in May, at the time of electing "borough officers." In consequence of this difference of opinion, two directors were elected in March, and two directors in May 1837. The important question then arose, which of those newly elected sets of directors were entitled to a seat in the board. The president of the board, by a letter dated the 7th of June 1837, informed the superintendent of common schools of the existing difficulty, and requested his opinion on the subject, and at the same time expressed the intention and willingness of the board to admit either set of directors that the superintendent should consider entitled to a seat. To this letter no answer was given. A majority of the board were of opinion that the directors elected in May were entitled to a seat in the board, and they were admitted accordingly, and Daniel Mershon, the present plaintiff in error, appointed district treasurer. The board proceeded as usual to levy a district tax, issued their warrant to the collector, and forwarded to the superintendent of common schools the *certificate* required by the twelfth section of the act of the 13th of June 1836. On the receipt of which the superintendent drew his warrant on the state treasury for the amount due the Youngstown district, in favour of the Youngstown district treasurer; and he received the money, and has paid out every cent of it on orders regularly drawn by the president and

VII.—2 s

[Mershon v. Baldridge.]

signed by the secretary of the board, for materials found and work done in repairing the public schoolhouses in the district, and for tuition.

In the mean time the two directors who were elected in March 1837 formed what was called a "*new board*" by the appointment of four persons, whom they associated with themselves as directors, and thus constituted, claimed for themselves the right to manage the concerns of the schools in the district, and the possession of the school funds that had come into the hands of the district treasurer.

In the month of July 1837, the superintendent of common schools published a circular, specifying certain days upon which he intended to visit the county towns in divers of the western counties of the state, for the purpose of obtaining information in regard to the common school system, and of settling any disputes that might exist between adjoining districts, &c.   The day appointed for his attendance at Greensburgh, in Westmoreland county, was the 11th of August 1837.   He however arrived in Youngstown on the 10th, and immediately on his arrival convened the new board of directors, heard their statement, and decided in their favour in the absence of the old board, all of whom (with one exception) were out of town at the time; and without any notice to the old board, the paper marked "B," dated "Youngstown, the 10th of August 1837," and signed "Thomas H. Burrowes, superintendent of common schools," was served on the present plaintiff in error, the then treasurer of the district, requesting him to deliver the school funds in his hand to Daniel Bonbright, the treasurer appointed by the new board.

The old board of directors, considering the proceeding illegal, irregular and void, paid no further attention to it, but proceeded in the usual course of their duty ; went on and finished the repairs and improvements of the public schoolhouses, which they had before this time commenced, kept the schools in operation, and drew their orders on the treasurer for the price of materials, labour and tuition, all of which were regularly paid off by him until the whole of the funds in his hands were expended.

In the mean time the new board of directors commenced the present action against the treasurer of the old board to recover from him the funds which he had received from the state.

On the trial of the cause in the court below, the court decided : First, that the superintendent of common schools had the right to decide in the premises, as to which were the legal board of directors, and that his decision was final and conclusive between the parties. Second, that the defendant was estopped from giving in evidence any orders or receipts for money which bore date after the 10th day of August 1837.

*Armstrong*, for plaintiff in error, alleged that the court erred in both these points, and contended that the superintendent of common schools had no jurisdiction in the case.   He is not constituted a

[Mershon v. Baldridge.]

visitor of common schools by act of assembly, having general and exclusive jurisdiction such as visitors of ecclesiastical corporations have in England.   There the office of visitor is exercised by the founder or endower of the corporation, or by the person or persons whom such founder or endower may appoint, and this office is not exercised arbitrarily according to the mere whim or notion of the individual exercising it, but according to the laws and statutes of the institution.   1 *Bl. Com.* 483.   But with regard to *civil* corporations the king is founder and visitor, and the law has appointed the place wherein he shall exercise this jurisdiction, which is the court of king's bench.   The law having by immemorial usage appointed them to be visited and inspected by the king their founder, in his majesty's court of king's bench, according to the rules of the common law, they cannot therefore be visited any where else, or by any other authority.   1 *Bl. Com.* 481.

But the secretary of the commonwealth is not constituted a visitor of common schools in this respect, but merely a superintendent in regard to certain specific duties, which are expressly limited and clearly defined by the 10th section of the act of the 13th of June 1836, part 4th.   "If any controversy should arise among the directors of any district or adjoining districts, *concerning the duties of their office,* the distribution of the state appropriation, or the levying and collection of taxes," he is hereby authorized to settle and adjust the same without costs to the parties.   Here are his duties clearly and distinctly pointed out, and *expressio unius est exclusio alterius.*   If the legislature had intended that the superintendent of common schools should also be the judge in cases of contested elections for directors, it would have expressed that intention, as it has done in the other duties assigned him, in clear and unequivocal terms. It cannot therefore be contended that the legislature would divest the courts of common law of their jurisdiction in this case, or that it would vest so important a power in an individual whose tenure in office is so very uncertain.

But if the superintendent of common schools is vested with the power to sit as judge in cases of contested elections for directors, and judge too in the last resort, he must necessarily be invested also with powers co-extensive with the duties of his office ; he must have the power to send for persons and papers, the power to enforce obedience to his decrees, the power to carry his decisions and judgments into execution, in a word all the powers incident to and exercised by a court of general quarter sessions of the peace or court of common pleas.   And where are all these powers granted or given?   Not in the statute book, not by the common law of the land, not as visitor because he cannot stand in that relation to the institution either as founder or endower, but he is to be clothed with this important and extensive power by mere implication or construction.   But this implication cannot be raised by a fair and legal construction of the act of assembly.   One principle well established in the construction of

[Mershon v. Baldridge.]

statutes is, that a statute which treats of things or persons of an inferior rank, cannot, by *general words,* be extended to those of a superior rank.    1 *Bl. Com.* 88.    As where a statute treating of deans, prebendaries, parsons, vicars, and others of *spiritual promotion,* deans being the highest persons named, bishops who are of a higher order are not included under the general words, although they have spiritual promotion; *Co. Lit.* 210; but in the statute under consideration there are not even general words to help out the construction contended for.

By the 15th section of the act of assembly of the 13th of June 1836, it is very clear that the superintendent of common schools had no authority whatever to interfere with directors elected under the provisions of former laws, much less to deprive them of their office in the summary and arbitrary mode attempted to be practised in this case.    The 15th section provides that "school directors elected under the provisions of former acts shall severally hold their offices during the term for which they were elected ; and all appropriations authorized by former acts, whether by the state or county, and all taxes authorized for school purposes shall be collected as they would have been collected if this act had not been passed."    So that by the very act of assembly by which the superintendent claims to derive the authority which he has exercised in this case, he is estopped from interfering under any circumstances in regard to the tenure of their offices.    Those directors which he has attempted to disfranchise are entitled to hold their office during the time for which they were elected. If the old board of directors had been in the exercise of this office by usurpation or contrary to law, the legislature has provided an ample and efficient remedy, and the only remedy that could have been applied in the present case—I mean the writ of *quo warranto,* as provided under the act of 14th of June 1836 ; and here there is no implied power to be exercised, but full and express power to remedy the evil if any existed.    We contend therefore that the superintendent had no authority to act in the premises, that his interference was not warranted by law and was consequently void, and if he had any authority or power in the case at all, it only extended to the two directors elected in 1837, and not to the old board generally.    The old board of directors were (with the exception of the two directors elected in 1837) elected under the provisions of the act of the 1st of April 1834. As to the time and mode of their election there could be no dispute ; they were the legal board then, and are so yet.    There cannot be two legal boards of directors in the same district at the same time, and consequently the present plaintiffs are not the legal board of directors and therefore cannot maintain this action.

But supposing the present plaintiffs to be the lawful board of directors, which is not admitted, yet they have no right to recover in this action any thing beyond the unappropriated funds in the hands of the treasurer.    The plaintiff in error offered to prove, on the trial of the cause below, that he had paid out all the funds which he had

[Mershon v. Baldridge.]

in his possession, in the due exercise of his office, and in strict conformity with the provisions of the 9th section of the act of 13th June 1836; this evidence was rejected by the court, and is now alleged for error. The superintendent of common schools had been apprised as early as the 18th of March 1837, that a difficulty existed in the Youngstown district in regard to the school directors elected that year, as is evident by his letter of the 29th of March to Graham & Coulter, and also by Mr Toner's letter dated 27th June 1837; but we find that afterwards, on the 3d of July following, a warrant issues in favour of the plaintiff in error for the amount of the Youngstown district's proportion of the state appropriation, accompanied with directions as to the mode of applying it; and this was received in good faith, without any fraudulent, covert or undue means, either on the part of any of the members of the old board or their treasurer. We contend then that the plaintiff in error was justifiable (notwithstanding the notice of the superintendent, dated at Youngstown, 10th of August 1837) in paying the orders drawn by the old board. That notice carries on its face conclusive evidence of its extrajudicial character and irrelevancy to the duties assigned the superintendent of common schools by the act of 13th of June 1836. His authority, by virtue of this act, only extends to the settling of controversies among the directors of any district or adjoining district in regard to *the duties* of their office. Now mark how foreign are the contents of this notice, and the matters to which it relates, to the duties of directors in the exercise of their office? This notice commenced by stating that "objections had been stated to him against the *legality* of the treasurer's appointment for the Youngstown district, which, upon full investigation, at which the treasurer had been invited to be present, he had found to be valid." Waiving for the present the superintendent's right to interfere in the question of the treasurer's appointment (without admitting that right), we ask what were the objections against the legality of the treasurer's appointment? when and where made? when and where did this full investigation take place? and what was the invitation, by whom, and in what manner given to the treasurer to be present? Now I will not say that satisfactory answers in the affirmative cannot be given to any or all of these questions; but this I will say, that not a particle of evidence of any of these facts exists in the case.

But further in respect to this notice. It requires the plaintiff in error to "pay over all moneys, that may have come to his hands as district treasurer, to Daniel Bonbright, the legally appointed district treasurer, who will give you credit for all payments you may have made for tuition, work or materials, *authorized by the board of directors previous to 1st of May* 1837?" Authorized by what board? Not by the new board composed of the two directors elected in March 1837, and the other persons whom they had appointed; for that board (if board it can be called) had not then been organized, nor never has been legally organized. If there had been no directors elected in the

[Mershon v. Baldridge.]

district previous to 1837, or if the old board of directors had forfeited their right to hold the office or held it by usurpation, the citizens of the district should have elected six directors (a full board) under the provisions of the second section of the act of 1836 ; but by electing only two directors, to supply the place of those whose term of office had then expired, they recognized the legality and existence of the others. But those two directors elected in 1837 had not the right to complete or constitute a new board by appointment ; their case did not present any of those occurrences, pointed out by the act, in consequence of which they would have had the right to fill vacancies by appointment. By the third section of the act of 13th June 1836, it is provided that, " within twenty days after said election, each board of school directors shall organize by choosing a president and secretary of their own body; they shall also appoint a treasurer for the district; they shall also have power to fill any vacancy which may occur in their board, by death, resignation or otherwise, until the next election, when such vacancy shall be supplied by electing a person to supply the same." The act of assembly contemplates a board in existence, a proper organization of that board within the time limited, and, in case of a vacancy occurring in that board thus in existence and organized, it gives the right to that board to fill such vacancy by appointment ; but how different was the proceeding by the two directors elected in March 1837. Before they could organize, they had to appoint the materials with which to organize, and thus proceed in a manner wholly unauthorized by the act of assembly, and in direct contravention of its provisions. But that the old board were then and are now the legally constituted board there can be no doubt. The superintendent himself had recognized it as such up to the 1st of May 1837: that board had drawn the former appropriations from the state, as appears by Mr Little's deposition. Then, I ask, when did that board become illegal, and by what act or proceeding did it forfeit its right? That board has done nothing to forfeit its right. The law has not deprived it of any of its rights; for the law says that its members shall exercise their office during the time for which they were severally elected. Then if the old board has not forfeited its right, and if the law has not deprived it of its right, it remains now as it was then, the legal board of directors; and the present plaintiffs are not the true board ; their appointment of D. Bonbright treasurer of the district was a nullity ; and the present plaintiff in error was not bound to pay over to him the school funds in his possession, as requested by the notice dated Youngstown, 10th of August 1837.

But another very singular feature of this notice is in the following words : " any payments for tuition or other purposes contracted for since 1st of May 1837 will be made at your peril, and will only be allowed on settlement of your accounts, in case they shall be ratified by Joseph Baldridge, Esq., Hugh Kells, James Belford, Benjamin Blythe, Esq., Joseph Coulter and James Mahon, the regular and legal board of directors." This imperative requisition is clearly *ex*

[Mershon v. Baldridge.]

*post facto,* it is retrospective in its requirements for a period of three months and ten days, and that too the very period during which the principal work was done, contracts made, and wages earned by the teachers; and for the moneys paid during this period he is to be allowed or not allowed credit, at the discretion of those persons who were engaged in this unpleasant and bitter controversy—those very individuals who now object to the plaintiff in error receiving credit for the moneys he had judiciously applied according to law, and for materials found, work done, in erecting and repairing the public schoolhouses in the district, and in the payment of teachers who had taught, amongst others, the children and grandchildren of the present plaintiffs.

But supposing that the plaintiff in error acted in his own wrong in the disbursing of the funds in his hands, and in applying them to the payment of orders drawn by the old board of directors, the law will not place him in a worse situation, or hold him to a stricter accountability than it would an *executor de son tort,* who in Pennsylvania is considered a trespasser, and held liable only so far as assets come to his hands, and if he has applied these assets to the discharge of the debts of the intestate, he will be entitled to credit in his account to the amount paid, if correctly applied. Stockton *v.* Wilson, 3 *Penns. Rep.* 129. In *trover* against an *executor de son tort* for the goods of the decedent, he may, under the general issue, give in evidence the payment of debts to the value thereof in mitigation of damages. Saam *v.* Saam, 4 *Watts* 432.

Upon the whole, we contend that the superintendent of common schools had no jurisdiction in the case; that if he had any authority, it was illegally exercised, and consequently his decision was void; that if the present plaintiff in error was not the rightful district treasurer, he received the funds in good faith, and applied them honestly to the purposes for which, by law, they were intended, and is therefore not liable to pay them a second time, and should have been permitted to give the orders and receipts in evidence on the trial of the cause.

*Nichols* and *Coulter,* for defendants in error, cited, 1 *Burrow* 204; 4 *Mod.* 106.

The opinion of the Court was delivered by

GIBSON, C. J.—It is obvious that the time of choosing supervisors and constables referred to for purposes of designation has regard exclusively to township elections. It would have been too general to order the school directors to be chosen at these, without more, for there are two of them—the first on the Friday preceding the third Saturday in March, for constables, supervisors, overseers and auditors, the second on the Friday preceding the first Tuesday in October, for township assessors and inspectors of the general election; and hence a necessity to designate the particular election by reference to

[Mershon v. Baldridge.]

the choice of particular officers at one of them.    But there was no room to designate a particular borough election, for there is no more than one ; and the choice of supervisors needed not to be an index for the time of choosing school directors by the inhabitants of a borough.    In point of reason, therefore, the reference is inapplicable to such a choice ; nor do the words seem to point to it.    "Annually" (in townships) "at the time and place that elections are held for supervisors and constables ; and, in wards and boroughs, at the time and place of the borough elections," is a passage which is free from ambiguity or inconsistency when considered distributively and in connexion with the interpolated words, whose omission, it is clear from the context, was accidental.    Had it been intended to make the time depend on the election of designated officers merely, it would have been unnecessary to say any thing about the denomination of the election ; whether township or borough, the designation would have been equally specific ; and it is reasonable to think that only one class of officers would have been specified, for it must have occurred to the framers of the law that designation by specifying more than one would be liable to interruption by their being separated in the organism of corporate bodies, a result produced in this very instance.    It is true that the same result might be produced by a new arrangement of the township elections ; but it was less likely to occur from an alteration of the general law than from particular provisions in acts of incorporation.    Besides, supervisors exist only in those boroughs which are left subject to the general road law ; and, not being corporate officers, the choice of them would probably be left to its regulation when that of borough constables, who are necessarily charged with corporate functions, would be regulated by the charter.

The interpretation of the superintendent, therefore, was an erroneous one ; and the inquiry is, whether it was accurately put to the jury as decisive.    His arbitrament would certainly be conclusive of a matter legitimately submitted to his decision by the statute ; and the point is, whether the submission embraces contested elections.    By the tenth section, "if any controversy should arise among the directors of any district or adjoining districts concerning the duties of their office, the distribution of the state appropriation or the levying or collection of taxes, he is hereby authorized to settle and adjust the same."    The present controversy obviously concerns not official duty, or the levy and collection of taxes, which are both posterior to questions of election ; nor is it easy to see how it concerns the distribution of the state appropriation.    It is said to concern it because it must be received before it can be distributed ; and it necessarily, though incidentally, involves the title to receive.    His authority, however, reaches no further than the distribution of money actually in their hands.    Had the legislature designed to give him cognizance of contested elections, they would not have suffered a grant so important to rest on a chain of deductions, especially as payment

[Mershon v. Baldridge.]

to directors *de facto* would discharge him. Beside, the power would be a despotic one; operating extensively on the dearest of popular rights, and scarce such as would be entrusted to an individual in a republic. Finally, it is by no means certain that a direct grant of it, in derogation of the visitorial powers of this court and of trial by jury, would be sustained; and we are therefore bound to bring the interpretation of the section within the admitted pale of the constitution. Regularity of election, therefore, remains to be tried by the constitutional arbiters of it in the ordinary course. In this view of the principal question, the points of evidence become irrelevant or unnecessary; and we intimate no opinion on them.

Judgment reversed, and a *venire de novo* awarded.